Good morning, Judge McEwen, Judge Schroeder, Judge Duffy. I'm Michael St. James, appearing on behalf of the appellant. Your Honors, this is a critical issue of very substantial economic impact affecting hundreds of millions of dollars of commercial transactions. Whatever this panel does, it's critical that you provide guidance to the community so that this issue can be dealt with intelligently. As it stands today, the only guidance in the Ninth Circuit is the Mayan Network's majority decision. And as I will discuss, that provides no instruction, either practical or analytical, to people engaged in leasing transactions. Can I just ask a preliminary question? Is this subject affected at all by the new Bankruptcy Act? No, Your Honor, I don't believe it is. I've looked at the leasing provisions in the Bankruptcy Act, and it really does not come up at all. As best as I can tell. Your Honor, it's important to understand the practical impact of Oldham, whether you choose to accept it or reject it. In Oldham, what the Second Circuit did in 1944 was to conclude that the landlord's security deposit should be applied against the landlord's capped claim. In bankruptcy, the landlord is limited to a one-year rent claim. The Oldham decision applied the security deposit against that. Your Honor, in order to understand the tremendous practical impact of this, consider today's leasing market in San Francisco. Annual rent for an office space may be $30 a square foot, but a landlord may be expected to fund $40 a square foot of tenant improvement allowance. Now, a tenant improvement allowance is nothing more than a loan made associated with the lease. And as Judge Schroeder pointed out in the Kukierman decision, a loan that's attached to a lease is part of the lease for bankruptcy purposes. What this means is that on day one of a lease in San Francisco today, the landlord may have loaned more than his maximum claim in a bankruptcy case just on the tenant improvement allowance without even addressing the balance of his damages. Now, if anyone other than a landlord were to make that loan, it could be collateralized. But the thrust of Oldham is to say that if the landlord makes that loan, it cannot be collateralized. There is an upper limit to what a landlord can receive as collateral for lease obligations, no matter how vast the extension of credit. Your Honors, there is no policy or purpose served by this. You know, your argument makes sense to me, but I'm a little bit held up by Congress. Because if you look to the history and the policy discussion there, it's the opposite. So if I had a clean slate, what you say makes a lot of common sense. So in light of that, what do we do to not get tripped up by what was actually quite clear from Congress? Well, and, Your Honor, I guess I do disagree. I think what was quite clear from Congress was the purpose of the cap was not to swamp bankruptcy estates with large unsecured landlord claims. I recognize that the legislative history references Oldham, but I think that the way it plays out is to say that somehow this one class of commercial activity can never be collateralized. It is you have to look to contracts with minors or contracts for an illegal purpose to find something that can't be collateralized like this. And I don't see anything in the legislative intent that suggests that Congress felt that way about landlords. But passing that, whether you accept Oldham, and I would point out that only one Circuit Court of Appeal has ever applied Oldham up until this panel in the 60 years that passed since the original decision. And I think that's meaningful, because applied in practice, it does make no sense and it does yield, you know, impossible results. Well, have they rejected it? No. Well, I don't know what we do with that. All right. Even if the panel accepts Oldham, the thrust of this appeal is that it should not be extended to third-party transactions. And, Your Honors, I would point out that there is a long and well-established body of law which, as best as I can tell, has never been contradicted by any court to the effect that guarantee obligations are entirely independent of the bankruptcy process, and the creditor's rights against the guarantor are unaffected by Section 502b6, are unaffected by the landlord's cap. The creditor's collections from a guarantor are unaffected by 502b6, are unaffected by the cap. And, Your Honor, this body of law is at the core of Ninth Circuit jurisprudence. There is any number of cases, many of which are cited in our brief, to the effect that the bankruptcy court simply does not have the power to insert itself between a creditor and a third-party guarantor and alter their relationship. And, Your Honor, that is exactly where this appeal takes us. A letter of credit is clearly a species of third-party guarantee, and the Condor systems case discussed it as such. And as a third-party guarantee, it doesn't come into play with the bankruptcy cap. What the bankruptcy cap says is take the landlord's claim as of the commencement of the bankruptcy case and limit it to one year's rent. There is no provision that suggests that if he has any other source of recovery, whether from a guarantor or from a letter of credit, that would further reduce the claim. Now, Your Honor? But in the Condor case, they didn't suggest that every letter of credit, which is a third-party instrument, would somehow escape classification as a security deposit. Isn't that correct? I mean, you're suggesting simply because it's a third-party instrument that it's not per se, then, property of the estate. And that is a proposition that's acceptable. But then don't you have to really look at what the nature of the instrument is and the fact that it's a third-party instrument isn't really the deciding factor? Well, Your Honor, I guess I disagree, because what I'd submit is that a security deposit in terms of a bankruptcy analysis means something very specific. Secured debt in the bankruptcy context is a critical issue which is well-established, both by the code and by case law. And secured debt means a secured creditor has an interest in property in which the debtor has an interest, and it is both of them having an interest in the same piece of property that defines secured debt. That's Section 506A of the Bankruptcy Code. Now, in the case of a security deposit, what we all think of as a security deposit, that is cash given to the landlord, there is secured debt. The landlord is holding, say, a million dollars of cash in which he has a million dollar interest and the debtor has a million dollar interest. A letter of credit is not secured debt and is not a security deposit. I mean, I agree that you can have a lease that calls it that, but the point of a security deposit. Isn't it functionally the same? Well, anything that provides you with recovery, you could call a security deposit if you want to. You could call a guarantor's obligation a security deposit if you wanted to. Are you suggesting that only cash can be a security deposit? I'm suggesting that only property of the debtor can be collateral, and that a security deposit ought to mean and is only understandable in the Oldham context as property of the debtor. Now, the debtor could post Blackacre as collateral for the lien, and that would be property of the debtor in which the landlord has an interest and the debtor has an interest, and that's secured debt for the purposes of 506A. But when the tenant posts a letter of credit, the case law is very clear that the bankruptcy estate has no interest in that letter of credit, and it's equally clear that the landlord has no interest in whatever was given to the bank to secure that letter of credit, so there is not secured debt for the purposes of 506A. But doesn't the mere existence of the letter of credit give some pause to your first argument, that is, about how these landlords are out making loans and so on and so forth? Instead of taking a loan from the landlord, why can't the tenant take the loan from the bank? Same as if he had a letter of credit. Your Honor, there's no question that people could restructure their transactions to do that, and maybe some tenants don't mind using up their borrowing base that way. I'm trying to deal with the... Why wouldn't landlords do that as a regular basis and thereby avoid all this problem? Require the tenants to borrow the money directly? Sure. Yeah. Simply because of the dynamics of the marketplace. When the marketplace expects the landlord to make a $40 tenant improvement loan, it does not mean that the tenant should go off and borrow $40 from a bank and thereby reduce the tenant's borrowing capacity. Well, the dynamics of the marketplace would be changed immediately if you gave notice to everybody, this can't happen anymore. And once that happens, the dynamics are changed totally and completely. They'll never go back to the way it was. That may be the result of this Court's ruling. Well, it may be, but it's not the same kind of economic impact that you were talking about at the beginning, was it? It would not have the same kind of economic impact that you were talking about at the beginning. If we say that landlords simply can never loan more than one year's...  They can do anything they want. Anyone can do anything foolish that they'd like to, you know, with a reason. We're not going to stop them, but if they want to be foolish, that's their business. Let me... Do you think that the law should go out and make whole people who do stupid things? I guess, Your Honor, I do not think that commercial leasing transactions are necessarily stupid things. Commercial leasing transactions are not stupid, but if you make a lease for the main building here in San Francisco and you make a lease for a dollar, that's stupid. I agree, Your Honor. Okay. Perhaps I could address the issue with the guarantees. Your Honors, I submit that what happened in Mayan networks was an invitation to jump down a rabbit hole that this Court should reject. In Mayan networks, what they basically said was that if the collateral would come back to the debtor but for the existence of a pledge of security, then it is a security deposit for the purposes of this analysis. That is, they say, let's look to the impact, and if there is money that would come back, however it comes back, then it's secured debt, it's a security deposit, and the old analysis should apply. Well, Your Honor, I submit that that analysis is unworkable in practice and analytically unsound. If you take our case, there's a million dollars of letter of credit. What if it had been secured by $500,000 of cash? Does that mean that $500,000 is the impact, is the security deposit for the purposes of the Mayan conclusion, and therefore $500,000 reduces the landlord's cap and the other $500,000 doesn't? What if the security deposit is – what if the letter of credit is supported by collateral of more uncertain value? For example, a lien on a patent. Does the Court try to value the collateral in order to determine the impact in order to reduce the landlord's cap? What if, for example, as in this case, unsecured claims against the bankruptcy estate are going to pay 100 cents on the dollar plus interest? Then do we have a situation where the $500,000 of cash security deposit has a $500,000 impact, but the $500,000 of unsecured claim reimbursement also has a $500,000 impact? How is a court supposed to analyze this? Take the same problems in the fact pattern of PPI, the only – the only circuit court decision to go Apelli's way thus far. And in PPI, what happens is in 1991, the lease is terminated. In 1991, the landlord draws down the letter of credit. And then in 1996, the bankruptcy case is filed. And the debtor says, we have to reduce the landlord's claim by the draw he took on the letter of credit, although it was many years ago. Why does this make sense? Well, the Third Circuit says, well, the landlord got that money, but then the bank had a reimbursement right. And so there's a claim there, and if we don't reduce the landlord's claim by this many years ago, well, then there'll be multiple claims there, and the cap will be evaded. Well, if you take the exact same analysis to a guarantee, you come to the exact same place, because if there's a collection from the guarantor, then the guarantor has a claim. And then if there's a bankruptcy filing many years later, we should reduce the landlord's cap by the guarantor's claim. Do you think it makes a difference in the case of Mayan Networks that there was a contractual provision regarding the letter of credit proceeds and the refund? I think it made a difference to the Mayan Network court. But what I'd like to suggest is that as a basis for decision, it's a very imprudent one. There may be contractual rights. There may be just subrogation rights. For example, in the guarantor that I'm positing, it could be a contractual agreement to repay. It could be subrogation to repay. You get to the claim either way. And the question is, are you advocating an all-or-nothing proposition? In other words, we wouldn't go into these various nuances, but if you had a third party instrument in and of itself, that would not qualify as a security deposit that would be proceeds of the estate. I am saying that if it's not secured debt the way the bankruptcy code means it, then it's not property of the estate, and the court should not try to trace a series of impacts through various different parties to try to find some connection with the estate. If it's secured debt, which is a concept that every bankruptcy attorney and every bankruptcy judge understands, it gets applied against the claim. And that, I agree, is just the way the law works. But if it's not secured debt, if it's a right against the third party, whether it's a letter of credit, whether it's a guarantee, whether it's a third party pledge, or whatever it is, this court should leave it alone. And I submit that the final example is assume there's a guarantor in the PPI circumstance, and the landlord pays the guarantor or collects from the guarantor more than one year's rent. Well, when the bankruptcy case is ultimately filed, the guarantor will submit his claim to the PPI. He will be paid out. And the bankruptcy court will now be faced with a claim that's bigger than the landlord cap. And if you follow PPI, what that means is that we have to go to the landlord and make him give back to the bankruptcy estate or to the guarantor the excess. And, Your Honor, I submit that's absolutely absurd. Ginsburg. What is the amount of the unsecured claim under the district court's, the bankruptcy court's judgment? The as a practice, I mean, the simple way of seeing it is there's a $2 million capped claim. There was a $1 million letter of credit. There was $3 million of claim beyond the cap. We believe that we can apply the letter of credit against the $3 million. The bankruptcy court applied it against the $2 million. I understand that. I'm just trying to understand the difference in terms of the what's left of the what's the remaining unsecured claim under both theories. I'm just trying to get a dollar amount. Under my theory, the landlord still has a million dollars of unsecured claim unpaid. And under their theory, the landlord has nothing left. And there's a million dollars of cash sitting there that will go to equity. Perhaps I can reserve the rest of my time. Nay.  Thank you. Robert Franklin of Murray & Murray appearing on behalf of the appellee. Good morning, Your Honors. To clarify the last question, I understood that what's left under the of the unsecured claim is the $1 million. There's a $2 million allowed claim that the court of the lower court allowed, $1 million of which was satisfied by the draw on the letter of credit. And there's $1 million left in the estate which went to the landlord. So that's my understanding of that. Your Honors, this is not a case of a landlord being losing the benefit of his bargain or being deprived of an extra credit enhancement. This is a case where the landlord bargained for a $1 million security deposit. It could take the form of cash or a letter of credit at the tenant's option. While the record contains no evidence as to what the intent of the parties were per se, but it can be inferred from the lease itself that the tenant chose the letter of credit because perhaps it wanted to take advantage of interest that would be paid on the CD after the end of the lease, or it wanted to protect its deposit in the case of the landlord bankruptcy, where in the case of a cash deposit, that cash deposit would have gone to the landlord's general account. Whatever, the parties bargained for a security deposit, and the letter of credit was designated by the lease and treated by the parties as a security deposit. The tenant parted with $1 million in cash. The only difference is that it was deposited with the bank rather than the landlord. The effect on the estate is exactly the same. If the tenant defaults on the lease, the landlord draws on the letter of credit, and it's applied to the, and then the issuer goes to the debtor and forecloses on the CD. Mr. St. James raises a series of potential difficulties if the letter of credit is collateralized with what I'll call nontraditional, you know, for example, a patent or some other partial collateral which is not secured. What is your response to whether that actually poses a statutory hurdle in terms of implementing the intent of this statute? I think if the parties, I think it depends on the parties' intent and what the letter of credit is intended to do, as to be a security deposit. Now, if an issuer of a letter of credit undercollateralizes his letter of credit for some reason, which is, I wouldn't understand why a bank would do that, but in any event, it would still be applied to the cap, would be my response to that, is that the, if the landlord got $500,000 from the, on the proceeds of the letter of credit, then that would be applied to the cap. I guess he's saying that if you got an extra $500,000 that was undercollateralized, would that be applied to the cap? Yes, I think it would be, because it's a ---- Well, I guess the question was where does the floating $500,000 go? That was the question. Or is there a gap there, in fact? It may depend on whether the issuer's letter of credit is disallowed under 502E1. That may be where the analysis which Judge Klein had in his concurring opinion goes. They may have to analyze the impact on the estate, what comes out of the estate on that reimbursement claim from the issuer in the estate. And if the bankruptcy court or if the issuer is entitled to a secured claim, it can show that there's other value there, the IP patent that's worth $500,000 and they get $500,000 from the estate, then that's applied to the security deposit, to the  Going back to the ---- to what happens under the statute. The statute is plain. It doesn't divide a claim between secure. It doesn't say such unsecured claims shall be applied against the cap. It says such claim. And under 506, that claim must be divided into a secured and unsecured portion. Once the letter of credit is drawn upon and issued, that is applied to the secured portion, and the balance is an unsecured portion. The policy arguments, I think, are better addressed to Congress. The appellant would have this Court overrule not only Olden, but Congress, because the statute itself is an embodiment of Olden. Of Olden. Is this statute carried over into the new bankruptcy? It has no ---- it is not. It is carried over into the new statute, which is a good point. If Congress wanted to change this law, it had a perfect opportunity at this point in time to do that. The reply brief raises issues that were not really very well briefed beforehand, and I want to address them a little bit. But the reply brief relies heavily on Judge Klein's concurring opinion in Mayan Networks. As Judge Klein noted, I mean, he was discussing cases that were really not before the Mayan court, but even he recognized that where the debtor provided the funds that collateralized the letter of credit, the letter of credit must be treated as a security  The landlord essentially is arguing that it is the issuer of the LC that should bear the brunt of the policy considerations under Section 502B6, arguing that the secure claim must be disallowed under Section 502E. Section 502E has never been applied to the issuer of a letter of credit. It seems strange to harp on the independence principle and then argue that the issuer of the letter of credit is liable with the debtor on the underlying claim. There's a disconnect there. But even if Section 502E applies, the landlord says that the debtor's remedy is basically to add a turnover action under Section 542 to get back this collateralized funds, the CD. The landlord ignores 506D1 and D2, which basically says that the bank's lien survives a determination where the underlying claim is disallowed only under Section 502E. Your Honor, I don't have much more to add. I'm here to ask any questions, but I believe that the independence principle is not at issue here. Under the committee's application, the landlord receives its $2 million cap claim, the debtor's estate is impacted only to the amount of the cap, and the issuer of the letter of credit receives its security. I think we understand your position. Are there any questions? Just before you leave, exactly where is the reference to the CD that you talked about in the record? I don't think there is a specific reference to the CD in the record. I think it may be addressed in our brief, but I don't know that it's in the stipulation of facts. But the parties agree that the letter of credit was fully collateralized. Yes, but we don't know how it was fully collateralized. Correct. Okay. Thank you, Your Honor. Thank you. I think that however you decide this, you need to come to grips with the analytical framework. Now, Mr. Franklin talks about how the landlord's claim is divided into a secured portion and an unsecured portion. If this Court really wants to find that a letter of credit constitutes collateral, it has some explaining to do. Because that's contrary to all of the law to date. All of the law to date says that the debtor does not have an interest in a letter of credit, and under 506A, it's very clear that the debtor has to have an interest in the collateral in order for it to be secured debt. Again, Mr. Franklin wanders through what happens if the letter of credit is partially collateralized and posits that, well, that could never happen. Well, Judge Kaczynski's decision in Powering deals with a case in which the letters of credit are undercollateralized, and the question is how much new value is given in a preference context when you let go of a letter of credit that's undercollateralized. This happens. There are also any number of letters of credit that are issued without collateral at all. And so whatever this Court does, it has to come up with an analytical framework that works. You have to come to grips with not the easy case where there's a million dollars of cash and so we'll just sort of pretend that it's all the same as secured debt and treat it as property of the estate. You have to tell us what happens if there's only half a million dollars of cash. What happens to the other half a million dollars? What happens if there is a letter of credit for two times the rent? What happens if there's a guarantee for two times the rent? Are we really going to take money away from the letter of credit and give it back to the bankruptcy estate? Are we really going to take money away from a collection on the guarantor and give it to the bankruptcy estate so as to preserve this cap? Your Honors, I submit that the only intellectually sound way to handle this issue is on the basis of the Bankruptcy Codes analysis of what is a secured claim and what is an unsecured claim. And there is no collateral here. There is no secured claim here. And 502B says you determine the cap on the date of the bankruptcy filing. That's $2 million. 502 does not say go look and see if there's any other sources of recovery. In fact, the case law is very clear that where there is a guarantee, you don't apply it to 502B6. So, Your Honors, I submit that you can't take the loose sort of approach that was argued by Mr. Franklin and say, well, it's kind of like secured claims without doing a lot of damage to the Bankruptcy Code. And you can't take this loose sort of approach and say, well, if it's completely collateralized, it's okay. Okay. Your time has expired. Thank you, Your Honor. Thank you. I do want to say I think that's a very interesting case, and the briefs from both parties were extremely helpful and very, very well done. Thank you. Thank you. Thank you. The arguments were helpful, too. And the case just argued is submitted for decision. We'll hear the next case.
judges: Schroeder, McKeown, Duffy